UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

AMERIFAB, INC.,                          )
        Plaintiff,                       )
                              )
    vs.                                   )          1:04-cv-1331-LJM-WTL
                              )
VOEST-ALPINE INDUSTRIES, INC.,           )
        Defendant.                       )

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This cause is now before the Court on plaintiff's, AmeriFab, Inc., Motion for Partial Summary Judgment of Infringement of the '269 Patent, and defendant's, Voest-Alpine Industries, Inc. ("Voest"), Motion for Summary Judgment of Patent Unenforceability Due to Inequitable Conduct and Motion for Partial Summary Judgment of Patent Invalidity.  All three motions pertain to the claims and counterclaims brought by the parties related to U.S. Patent No. 6,330,269 (the "'269 patent").

The parties have fully briefed the issues, and the arguments are ripe for ruling.  For the reasons discussed herein, the Court **DENIES** AmeriFab's motion for partial summary judgment, **DENIES** Voest's motion for summary judgment on unenforceability and **DENIES** Voest's motion for partial summary judgment on invalidity.

## I.  BACKGROUND

### A.  THE '269 PATENT

The '269 patent matured from U.S. Application No. 09/697,272, filed October 26, 2000, but based upon Provisional Application No. 60/184,147, filed on February 22, 2000.  '269 Patent.  The

patent issued on December 11, 2001, to Amerifab, [sic] Inc., as assignee of the inventors, Richard

J. Manasek ("Manasek") and David P. Kincheloe ("Kincheloe").  *Id.*

The '269 patent is directed to "[a]n apparatus and method for cooling the interior wall of an

electric arc furnace."  '269 Patent, Abstract.  The independent claims of the '269 patent contain the

disputed terms.  They read:

> 1.  A heavy-walled steel, iron, cast alloy, or ferrous alloy pipe for use in a cooling
> panel in an electric-arc metallurgical furnace, comprising:
>> a unitary pipe, including:
>> a tubular section;
>> an elongated ridge extending outwardly from the exterior surface of said
>>> tubular section, said ridge extending along the length of the tubular
>>> section; and
>> a base section on the exterior surface [of] said tubular section, said base
>>> section opposed to said elongate [sic] ridge.

* * *

> 17.  A heavy-walled steel, iron, cast alloy, or ferrous alloy pipe for use in a cooling
> panel in an electric-arc metallurgical furnace, comprising:
>> a unitary pipe including:
>> a tubular section having a first portion and a second portion;
>> means, outwardly extending from the exterior surface of said first portion of
>>> said tubular section, for retaining transient matter, said means
>>> forming an elongate [sic] ridge; and
>> a base section on the exterior surface of said second portion of said main
>>> section, said base section opposed to said elongate [sic] ridge.

* * *

> 19.  A method of cooling the interior wall of an electric-arc furnace, comprising the
> steps of:
>> providing a panel, said panel including a plurality of unitary pipes, each of
>>> said pipes having a tubular section, an elongate [sic] ridge and a base
>>> section, each of said pipes being formed by extrusion;
>> attaching said panels to the interior of an electric-arc furnace; and
>> retaining transient matter from the electric-arc furnace on said elongate [sic]
>>> ridge.

2

'269 Patent, col. 5, *ll.* 18-28; *id.* col. 6, *ll.* 22-34; *id.* col. 6, *ll.* 38-48.

The Court has already construed the disputed terms as follows: "base section" means "a support or foundation portion;" "rib" means "something resembling a rib of man in form in that it is longer than it is wide or tall;" "trapezoidal cross-section" means "a cross-section that has the form of a quadrilateral having two sides nearly parallel;" "means . . . for retaining transient matter" means "an elongated ridge extending from the tubular surface;" and the preamble contains a "cooling" limitation.

## B. THE INVENTION

Manasek and Kincheloe worked for a company called Fuchs Systems ("Fuchs"), which is now owned by Voest, prior to forming AmeriFab in 1992. Manasek Dep. at 13-14; Kincheloe Dep. at 11-12, 19. While at Fuchs and prior to 1992, Manasek and Kincheloe knew that Fuchs used heavy-walled copper splined pipes for cooling panels in electric arc furnaces. Manasek Dep. at 27, 30; Kincheloe Dep. at 42-43.

According to Manasek, during a customer visit to AmeriFab, Tim Zion ("Zion") of Charter Steel expressed his desire to Kincheloe for a steel splined pipe for use in furnaces. Manasek Dep. at 36-37, 39. Kincheloe claims that customer Frank Dietrich ("Dietrich") challenged AmeriFab to solve the problem of cracking in nonunitary steel pipes that had slag retention devices welded onto the surface. Kincheloe Dep. at 35-36; 41-42; Kincheloe Decl. ¶ 5. However Manasek and Kincheloe decided to explore options for making unitary steel pipe, the pair contacted a company called American Extruded Products ("Amerex"), which specialized in metal extrusion. Manasek Dep. at 46, 98; Kincehloe Dep. at 61; Def.'s Exh. 4, Am. Extruded Prods. Brochure ("Amerex Brochure").

After speaking to Ed Zinser ("Zinser"), an engineer at Amerex, Manasek sent Amerex a drawing profile of the copper splined pipe that AmeriFab has used prior to conceiving the patented invention. Manasek Dep. at 34, 46-47, 52-54; Def.s' Exh. 5, Drawing, Pipe Cross Section, Various Dates. Apparently, Manasek had asked Amerex to duplicate the copper splined pipe in steel. Manasek Dep. at 55-56.

After he reviewed the drawing, Zinser explained to Manasek that he would have difficulty replicating the pipe in steel. Manasek Dep. at 55-56. Specifically, Zinser indicated that to extrude a steel pipe with fins, he would need to make the shape symmetrical in that additional mass would have to be added opposite the fins. *Id.* at 56-57; Kincheloe Dep. at 66-68. Manasek and Kincheloe considered various designs and went through several recitations of steel splined pipe. Manasek Dep. at 98; Kincheloe Dep. at 71. However, they ultimately decided on an opposite side that had a flat bottom with protruding ends as shown in the pictures of the preferred embodiment of the '269 patent. Manasek Dep. at 57-58. Manasek testified that the only real purpose of the flat bottom with protruding ends was for the mass balance of the fins. *Id.* at 60.

As mentioned earlier, AmeriFab filed a patent application on October 26, 2000, that matured into the '269 patent. '269 Patent. As the sole inventors and as part of the application process, Mansek and Kincheloe acknowledged their duty to disclose prior art to the U.S. Patent & Trademark Office ("PTO"). Def.'s Exh. 6, Patent Prosecution History, Decl. & Power of Atty.

Immediately thereafter, by letter dated October 31, 2000, Manasek and Kincheloe, on behalf of AmeriFab, sent a letter to the president of Fuchs, alerting Fuchs to the newly-filed patent application directed to steel splined pipe. Def.'s Exh. 7, Letter, From AmeriFab, Inc., To President, Fuchs Sys. Inc., Oct. 31, 2000, at AM0002262 ("Notice Letter"); Kincheloe Dep., at 81-83.

4

Kincheloe testified that the letter sent to Fuchs was one of many sent to the entire industry. Kincheloe Dep. at 78, 80-83.

By letter dated November 30, 2000, via facsimile, patent counsel for Fuchs responded directly to Manasek and Kincheloe. Def.'s Exh. 9, Letter, From Richard K. Warther, Allen Dyer Doppelt Milbrath & Gilchrist, P.A., To David Kincheloe & Richard Manasek, AmeriFab, Inc., RE: Investigation of AmeriFab Patents for Heat Exchange Pipe, Our File No. 59653, Nov. 30, 2000 ("Nov. 2000 Fuchs Letter"). In the letter, Fuchs, by counsel, stated that it

> . . . would like to bring to [AmeriFab's] attention that Fuchs Systems, Inc. has been using finned pipes for a heat exchanger application for eight years in the United States and 12 years in Europe. This prior art should be very relevant to your prosecution of the patent application before the U.S. Patent and Trademark Office.
>
> [Fuchs] believe[s] that this knowledge concerning Fuchs' use of finned pipes for a heat exchanger application during the last eight years in the United States . . . should resolve this issue.

*Id.* at AM0000430. The letter also acknowledged that Fuchs did not know the content of the filed application and that "Fuchs . . . does not understand [AmeriFab's] claims of alleged infringement." *Id.* at AM0000429.

Kincheloe testified that he knew the letter was referring to copper splined pipe. Kincheloe Dep. at 88. Moreover, both Manasek and Kincheloe testified that they knew that Fuchs had been selling copper splined pipe for more than eight years in the United States. Manasek Dep. at 30-35, 154; Kincheloe Dep. at 43-44. The inventors disclosed the Fuchs letter to their patent counsel, Ralph Dougherty ("Dougherty"). Kincheloe Dep. at 87; Kincheloe Decl. ¶ 11.

Looking at the face of the '269 patent, AmeriFab nor the inventors disclosed copper splined pipe to the PTO during prosecution. '269 Patent, Refs. Cited. Although the '269 patent discusses

the state of the prior art regarding slag retention, there is never any mention of copper splined pipe. *Id.*

On December 19, 2000, at Kincheloe's direction, counsel for AmeriFab filed a Petition to Make Special with the PTO to request expedited processing of its patent application. Def.'s Exh. 13, Letter, From Gregory R. Everman, Esq., To David Kincheloe, Dec. 21, 2000; Def.'s Exh. 11, '269 Patent Prosecution History, Pet. to Make Special. As part of its petition AmeriFab conducted a prior art search and submitted a description of the prior art it had located. Def.'s Exh. 12, '269 Patent Prosecution History, Stmt. of Pre-Exam. Search & Disc. of Refs. Found. AmeriFab listed eleven patents that it "deemed most closely related to the subject matter encompassed by the claims" of its application. *Id.* As required, the petition detailed each reference and particularly pointed out how the subject matter of the '269 patent was patentable over each reference. *Id.* In summary, counsel for AmeriFab stated:

> The claimed invention is clearly distinguishable from the references discussed above. None of the references disclose a <u>unitary</u> pipe including a tubular section, ridge and a base section opposed from the ridge. As defined on page 10, lines 10-14, the term "unitary" requires the tubular section, ridge and base section to be formed as one part. Further, the references do not disclose a base section opposed to a ridge.

*Id.* (emphasis in original).

On March 28, 2001, the PTO issued an Office Action that rejected all of the pending claims. Def.'s Exh. 14, '269 Patent Prosecution History, Office Action Summ. In response, on June 27, 2001, AmeriFab filed an Amendment. Def.'s Exh. 15, '269 Patent Prosecution History, Amendment. In the Amendment, AmeriFab made no substantive changes to the bulk of the claims and it argued that the invention was distinguishable from the prior art cited by the examiner because it was unitary. *Id.* at 3. Specifically, AmeriFab argued:

In reviewing the cited references, neither Gritsuk nor Rechards teach a "unitary" pipe. In fact, both references teach a multi-part apparatus which includes a tub section, a base section, and fins. These components are **welded** together. They are not one continuous apparatus as disclosed in the present invention. It is submitted, that by eliminating the necessity of joining separate components to form an apparatus, the present invention presents a novel, patentable feature. Thus, present invention [sic] is not anticipated by either Gritzuk or Rechards. . . .

*Id.* at 4 (emphasis in original).

On September 10, 2001, the examiner issued a Notice of Allowability. Def.'s Exh. 16, '269

Patent Prosecution History, Notice of Allowability. He stated:

The following is an examiner's statement of reasons for allowance: allowance of claims 1-19 is indicated because the prior art of record does not show or fairly suggest an alloy pipe for use in a cooling panel in an electric arc furnace comprising a unitary pipe which includes a tubular section having an elongate ridge extending outwardly from the exterior surface of the tubular section and extending along the length of the tubular section and a base section which is opposed to the ridge and is on the exterior surface of the tubular section.

*Id.* at 2.

## C.  PRIOR ART

### 1.  Copper Splined Pipe

Apparently, AmeriFab used extruded copper splined pipe prior to February 1999. Manasek

Dep. at 109-10; Pl.'s Exh. 12, Invoice, Mar. 4, 1999 & Purchase Order, Dec. 10, 1998 ("Pre-Feb.

1999 Pipe Order"). More specifically, the copper splined pipe was extruded per the dimensions of

a drawing of a pipe with uniform thickness around, but with two opposing splines on one side at a

52° angle from each other. Pl.'s Exh. 12, Pre-Feb. 1999 Pipe Order; Pl.'s Exh. 11, AM0000251,

Copper Splined Pipe Drawing. The pipe was made from a particular copper identified as "Alloy

CDA 122." Pl.'s Exh. 12, Pre-Feb. 1999 Pipe Order. Manasek testified that he believed the pipe

7

was made from CDA 102, or "OFHC copper." Manasek Dep. at 109-10. "CDA" refers to "Copper Development Association, Inc." designations. Manasek Decl. ¶ 9. "OFHC" refers to "oxygen-free, high-conductivity," and is associated in the literature with a Unified Number System ("UNS") designation C10100 or C10200. Ries Decl. Exhs. 7 & 8; Manasek Decl. ¶ 9. "CDA" copper designations may or may not include the "DA" or even the "CDA," and often the last two numbers of the UNS system are dropped. Manasek Decl. ¶ 9. Weiland Metals, Inc. and Wieland-Werke AG (either or both, "Wieland"), uses "K20" to identify UNS designation C122000. *Id.* Generally, the CDA divides its designations for coppers and copper alloys into subcategories, or families: coppers (C10100-C15999 and C80000-C81399), high copper alloys (C16000-C19999 and C814000C83299), brasses (C21000-C49999 and C83300-C89999), bronzes (C50000-C69999 and C90000-C959999), copper-nickels (C70000-C73499 and C96000-C96999), and special alloys (C99000-C99999). Reis Decl. Exhs. 2 & 3. There are no designations for "pure copper." *Id.* Exh. 4. The CDA identifies materials from C10100-C13000 as "commercially pure" and "unalloyed" copper. *Id.* at Exhs. 4 & 5.

Manasek testified that any portion opposed to the fins of a splined pipe would be a "base section" as he used the term. Manasek Dep. at 115-16. However, the drawings for Voest pre-February 1999 copper splined pipe shows a uniform wall thickness except for the splined portions, which are off-set to one side and are approximately 60° apart. Pl.'s Exh. 10, Wieland-Werke AG Drawing, 02.06.93. There is a picture of a cross-section of copper splined pipe in an AmeriFab 2002 presentation, taken by Gabriele G. Carinci ("Carinci"), currently President of AmeriFab. Def.'s Exh. 21, Presentation, AmeriFab, Inc., American Owned; American Made, 2002, at AM0000653 ("AmeriFab Presentation"); Carinci Decl. ¶¶ 2, 4, 5. Carinci does not recall the exact angle at which

he took the picture in the presentation.  Carinci Decl. ¶ 5.  There is no information contained within the presentation, or any other source given to the Court, about the thickness of the copper splined pipe at the end opposite the splines.  Def.'s Exh. 21, AmeriFab Presentation, at AM0000653.

## 2.  French & U.S. Counterpart Reference

French Patent No. 2 336 648 (the "French '648 patent"), first published on July 22, 1977, and the closely related U.S. Patent No. 4,033,561 (the "'561 patent") (these two patents collectively, "French patents"), which issued on July 5, 1977, disclose extruded finned pipes (referred to as "tubes") used for cooling the walls of shaft and blast furnaces.  Def.'s Exh. 3, French Patent No. 2 336 648 at 3, *ll.* 5-11 ("French '648 Patent"); Def.'s Exh. 5, U.S. Patent No. 4,033,561, at col. 4, *ll.* 7-11 ("'561 Patent").  In the French '648 patent the description of the invention states:

> The cooling box according to the invention is carried out in the form of a screen constructed as a boiler panel, with finned tubes (2), either laminated or extruded. These tubes, as shown in Figure 3, are welded together using two of their fins.  The coolant fluid enters at the lower end of the tubes, and is removed at the upper end. The inlets (4) and outlets (6) of coolant fluid are placed individually on two or three rows, in order to limit the weakening of the casing at that point, and to allow several independent circuits to be set up.

French '648 Patent, at 3, *ll.* 6-11.  The claims of the French '648 patent read:

> 1 - Cooling box for the boshes of tank furnaces, and in particular blast furnaces, characteristic in that it is carried out in the form of a screen of finned tubes (2) welded together by two of their fins, the inlets (4) and outlets (6) occurring individually on at least two rows.

> 2 - Cooling box according to Claim 1, characteristic in that the input of coolant fluid takes place at the lower end of said tubes, removal taking place at their respective upper ends, so as to obtain a rising circulation of coolant fluid.

> 3 - Cooling box according to one of the Claims 1 and 2, characteristic in that it is used with other identical boxes, and possibly with cooling boxes of other kinds,

in order to cover a very large part of the emitting surface, while at the same time providing a dependable support for the refactory wall.

     4 - Cooling box according to any one of the Claims 1 through 3, characteristic in that it is placed perpendicular to the thermal flux to be extracted.

*Id.* at 4, *ll.* 1-13.

The European Patent Office ("EPO") cited the French '648 patent to reject AmeriFab's

European patent application, Int'l Pub. No. WO 01/63193 A1, equivalent of the '269 patented

invention. EPO Office Action, 12.11.2004. Specifically, the EPO states:

> Claim 1 [of the AmeriFab application] is directed to a heavy-walled steel, iron, cast alloy, or ferrous alloy pipe. The protection sought [sic] in claim 1 is not restricted to the intended use in an electric-arc furnace.
>
> A unitary pipe of a cooling panel for a furnace is also known from document D1[, (the French '648 patent),] especially page 3, lines 6-10 and Fig. 3.
>
> Contrary to claim 1 of the present application, D1 does not explicitly disclose a base section on the exterior surface of the tubular section, opposed to the elongated rige [sic].
>
> However, the claimed feature "base section" has so a vague [sic] meaning that the subject-matter of claim 1 is not clearly distinguished from the pipe known from D1.
>
> Therefore, the novelty of the subject-matter of claim 1 cannot be acknowledged. The same objection arise in independent claim 17.

*Id.* at 1-2. The EPO suggested that the claims would be allowed if AmeriFab limited the "base

section" to one with protruding ends that was opposite of the elongate ridge. *Id.* at 2-3. In its

response to the office action, however, AmeriFab disagreed with the EPO examiner on the scope of

the French '648 patent stating:

> The Examiner suggested also including the feature of the base section having protruding ends and an indication that the base section was suitable for connecting the unitary pipe to a plate of a cooling panel. We have not introduced these features as we do not believe that they are necessary in order to distinguish the invention over

10

the prior art. FR-2,336,648 (D1)[, the French '648 patent,] describes a cooling arrangement in which the cooling tubes are disposed between the refractory material to be cooled and the facing or casing of the furnace. This is indicated in D1 on page 2, lines 18 and 19, "entre le réfractaire à refroidir et le blindage à protéger du four à cuve".[sic] The present invention provides a cooling panel which provides, on the inside of the furnace, a splined pipe for use within an electric arc furnace and which is in direct contact with the hot molten slag. Claim 1 has also been amended to clarify that the unitary pipe is provided on the inside wall of the furnace. None of the prior art systems provide a blast furnace cooling system which has a cooling panel inside the furnace and having the claimed structure to assist in slag retention.

In view of the above comments, we believe that revised Claim 1 is novel over the prior art.

Letter, From Jonathan Midgley, Marks & Clerk, To EPO, Our Ref: JLM.PA 5358 PCT/EP, 21 Mar. 2005.

After a telephone consultation on June 3, 2005, with the inventor's representative, the EPO issued an "Invitation pursuant to Article 96(2) and Rule 51(2) EPC" ("EPO invitation"). Invitation Pursuant to Art. 96(2) & Rule 51(2) EPC, Ref. JLM/CG/EPP88428, 09.06.2005 ("EPO Invitation"). In the EPO invitation, the examiner rejected AmeriFab's application because "it [did] not meet the requirements of the European Patent Convention." *Id.* The examiner referenced the conversation he had with the inventor's representative during which the examiner expressed concern that "the base section of the claimed pipe has no clearly defined structure, [therefore,] no difference may be seen with the cooling pipe known from D1[, the French '648 patent], Fig. 1, 3." *Id.* The examiner proposed adding the feature "and having a planar bottom," at a minimum, or that feature "**together with** the feature 'and suitable for connecting the unitary pipe to a plate (18) of the cooling panel,'" to overcome the examiner's objection. *Id.* (emphasis in original).

In the '561 patent, the extruded finned pipes are a modified form of the claimed invention. The '561 patent states:

According to another aspect of the invention there is provided a cooling plate for the boshes of shaft furnaces and particularly blast furnaces, the plate taking the form of a screen of finned tubes welded to each other by two of their fins, and having inlets and outlets formed individually on at least two rows.

'561 Patent, col. 2, *ll.* 14-19.  And the '561 patent specifies that:

[t]he modified form illustrated in FIGS. 5 to 7 relates to the cooling of the boshes of shaft furnaces and in particular of blast furnaces.  In this variation used is made of a plate or screen formed by rolled or extruded finned tubes 62, as in the case of a boiler panel.  As can be seen from FIG. 7, these tubes are welded to each other by two of their fins.  The inlets 64 and outlets 66 for the cooling fluid are formed individually on two or three rows so as to reduce weakening of the facing at this zone and to permit the use of several independent circulation paths.

'561 Patent, col. 4, *ll.* 7-17.  It appears that the claim that corresponds to this aspect of the '561

patented invention reads:

8.   In a shaft furnace bosh of the type including an outer facing, an inner refractory wall, and at least one cooling plate for cooling the bosh during operation of the furnace, the improvement wherein said cooling plate comprises:

a plurality of vertically extending tubes positioned between said facing and said wall, said tubes being spaced from each other in the circumferential direction of said bosh;

each said tube having spaced circumferentially there-around a plurality of longitudinally extending fins;

fins of adjacent of said tubes being welded together;

each said tube having a first end thereof a fluid inlet extending outwardly though said facing;

each said tube having a second end thereof a fluid outlet extending outwardly through said facing;

and inlets being positioned to be aligned in plural horizontal rows, and said outlets being positioned to be aligned in plural horizontal rows, thereby reducing the weakening of said facing in the zones thereof through which said inlets and outlets extend.

*Id.* col. 4, *l.* 64 to col. 6, *l.* 9.

The '561 patent also discloses:

[T]he plate in accordance with the invention enables self-lining to take place. Since the plate is in fact generally very cold during the normal operation, the formation of slag causes the formation of a solid skin which is of fairly low conductivity and limits transfer. When flow ceases, the deposit is consolidated and equilibrium is gradually established between the quantity of heat supplied and absorbability. Such self-lining cannot be achieved in the conventional cooling systems, since it is illusory to suppose that liquid slag will set on a metallic mass which is 800°C and is saturated as regards transfer capacity. The result is that the slag continues to be renewed and is the cause of excessive overloading of the conventional cooling system, the plate of which begins to melt.

*Id.* col. 3, *l.* 60 to col. 4, *l.* 6.

### 3. The British References

Two British patents that were not disclosed to the PTO during prosecution of the '269 patent that Voest claims are relevant to the invalidity inquiry are British Patent No. 1,088,827 (the "British '827 patent") and British Patent No. 1,064,506 (the "British '506 patent"). The British '827 patent is entitled: Improvement in Finned Tubes Especially for Heat Exchanger Tube Walls. British Patent No. 1,088,827, at 1 (Oct. 25, 1967) ("British '827 Patent"). The British '827 patent claims:

1. A heat exchange tube member for a gas-tight wall panel comprising a body portion having a bore or a row of bores formed therein and two external fins formed integrally with the body portion, the fins extending longitudinally of the tube member and projecting away from each other with their roots lying to one side of a diametral [sic] plane of the bore or of a plane containing the axes [sic] of the bores, the span between the end portions of the fins remote from the roots being greater than all other spans of the tube member in directions parallel to the line joining said end portions, and including means providing a longitudinal reinforcement of the tube wall on the side of the diametral [sic] plane or plane containing the axes [sic] remote from the fins.

2. A heat exchange tube member according to Claim 1, in which the longitudinal

13

reinforcement is provided by a thickening of the tube wall.

 3. A heat exchange tube member according to Claim 1, in which the body portion has a single bore and in which the longitudinal reinforcement is provided by at least one outwardly projecting rib on the tube wall, extending in a longitudinal direction of the tube.

* * *

 5. A heat exchange tube member according to any preceding claim, in which the fins provide part of a planar surface extending between the end portions of the fins.

* * *

 9. A heat exchange tube member according to any preceding Claim, in which each fin is provided with corrugations for facilitating the accommodation of longitudinal thermal expansions of the tube member.

* * *

 11. A tube panel composed of a plurality of heat exchange tube members according to any preceding claim, with the heat exchange tube members arranged in side-by-side relation with adjacent fins secured together.

*Id.* at page 2, *l.* 93 to page 3, *l.* 29. *See also id.* Fig. 7.

The British '506 patent is entitled:  Improvements Relating to Tubular Heat Exchange Elements.  British Patent No. 1,064,506, Apr. 5, 1967 ("British '506 Patent").  The British '506 patent claims:

 1. A tubular heat exchange element having an external fin tapering from root to tip and formed with an undulating surface, the depth, transverse of the fin, of the undulations increasing with the distance from the tube.

* * *

 5. A tubular element as claimed in any preceding claim, wherein the tubular element is formed with a single fin and the portion of the wall of the tubular element directly opposite the fin is of greater thickness than the portions of the wall of the tubular element immediately adjacent the fin.

14

*Id.* at page 2, *l.* 106 to page 3, *l.* 15.

### 4. <u>U.S. Patent No. 4,135,575</u>

United States Patent No. 4,135,575 (the "'575 patent"), which was considered by the PTO

examiner who issued the '269 patent, claims the following:

> **1.** A tube wall suspendable from a supporting structure for assuming the forces resulting from the dead weight of the tube wall and from additional loads, comprising
>
> a plurality of tubes extending parallel to one another and horizontal to inclined,
>
> said tubes include oppositely directed fins, the latter having longitudinal edges welded gas-tight respectively to one another, adjacent of said tubes thereby being operatively welded gas-tight to one another,
>
> said fins, respectively, being formed as a continuous band having a width exceeding the outer diameter of said tubes, respectively, said band being connected tangentially on an outerside of said tube, respectively, such that the thickness of the connection is at least as thick as the sum of the thickness of the tube and band, said bands being adapted to be suspended from the supporting structure,
>
> a tension chord [sic] forming one-piece with said tubes and constituting said band, the latter having a surface facing said tubes substantially tangentially aligned with the adjacent imaginary outer periphery of said tubes.
>
> * * *
>
> **3.** The tube wall according to claim **1**, wherein said bands and said tubes respectively are formed integrally.
>
> **4.** The tube wall according to claim **3**, wherein
>
> said bands have a thickness corresponding approximately to the wall thickness of said tubes, respectively.
>
> **5.** The tube wall according to claim **3**, wherein characterized in the
>
> said bands have a thickness exceeding the wall thickness of said tubes.

'575 Patent, col. 4, *ll.* 5-40.  In addition, the '575 patent teaches that "[w]ith the embodiment example according to **FIG. 2**, a finned tube is used, the tube **1*a*** and band **2*a*** of which are integrally produced, for example by rollers or extrusion devices . . . ."  *Id.* col. 3, *ll.* 24-27.

### D.  VOEST'S KNOWLEDGE OF THE '269 PATENT

Voest had knowledge of the '269 patent since at least 2002.  Pl.'s Exh. 65, E-mail, From Krieg Matthais, to Auer Werener & Villemin Bernard, RE: Patent App. WO 01/63193 – Copper Fin Panels, Nov. 4, 2002; Leal Dep. at 141-53.  However, on December 12, 2003, AmeriFab sent Voest a cease-and-desist letter, in which AmeriFab demanded that Voest cease making its steel splined pipe.  Pl.'s Exh. 49, Letter, From Ralph H. Dougherty, Dougherty, Clements & Hofer, To David Blunden, Voest Alpine, RE:  Patent Infringment, Our File: 931D/030979, Dec. 12, 2003.  By August 26, 2004, a letter from litigation counsel for AK Steel that sought indemnification from any damages as a result of a finding of infringement of the '269 patent also put Voest on notice of the '269 patent.  Pl.'s Exh. 55, Facsimile, From J. Paul Allen, AK Steel, To Claudia Leal, Voest-Alpine, Aug. 26, 2004.  On the same date that it filed this suit, August 12, 2004, AmeriFab sent Voest another cease-and-desist letter, which contained a copy of the complaint.  Pl.'s Exh. 92, Cert. Letter, From Donald E. Knebel, Barnes & Thornburg, to Othmar Scharrer, Voest-Alpine, Aug. 13, 2004.

By letter dated September 14, 2004, Voest conceded that its pipe has a "tubular section with elongated ridges or fins on the exterior surface of the tubular section."  Pl.'s Exh. 51, Letter, From Edward F. Welsh, Armstrong, Kratz, Quintos, Hanson & Brooks, LLP, To Donald E. Knebel, Barnes & Thornburg, RE:  AmeriFab, Inc. – U.S. Patent 6,330,269, Sept. 14, 2004, at VA 0814.  But, Voest contended that its tube

has no "base section which is opposed to the ridge and is on the exterior surface of the tubular section." In fact there is no base section at all as that term is defined in the patent and in the reasons for allowance. The VA pipe must subsequently be welded to something else to provide a "base section" or the like.

*Id.* (referring to '269 Patent, col. 4, *ll.* 52-56 & examiner's reason for allowance).

The ridges on the Voest steel splined pipe are spaced approximately 60° apart. Leal Dep. Exh. 46, Drawing, Special Steel Pipe "Splined," Pipe No. 01158051, M. Reyes, ENE/26/2004, at VA 0806. The pipe is thicker on the portion of the pipe opposite the splines. *Id.*

## II. STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also CAE Screenplates v. Heinrich Fiedler GMBH*, 224 F.3d 1308, 1316 (Fed. Cir. 2000). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *See id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Wollin v. Gondert*, 192 F.3d 616, 620 (7th Cir. 1999); *Schroeder v. Barth*, 969 F.2d 421, 423 (7th Cir. 1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994). The party opposing a summary judgment motion bears an affirmative burden of

presenting evidence that a disputed issue of material fact exists. *See Wollin*, 192 F.3d at 621; *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1031 (7th Cir. 1998); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir. 1992).  Moreover, the opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Wollin*, 192 F.3d at 621; *Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*, 184 F.3d 672, 677 (7th Cir. 1999); *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993), *cert. denied*, 511 U.S. 1005 (1994).  This burden cannot be met with conclusory statements or speculation, *see Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994) (citing *McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir. 1993)); *accord Chapple v. Nat'l Starch & Chem. Co.*, 178 F.3d 501, 504 (7th Cir. 1999); *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries*, 121 F.3d 281, 286 (7th Cir. 1997); *Foreman v. Richmond Police Dept.*, 104 F.3d 950, 957 (7th Cir. 1997); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994).  Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences in the light most favorable to the opposing party. *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999); *Wollin*, 192 F.3d at 621; *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992).  If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Stop-N-Go*, 184 F.3d at 677; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290,

1294 (7th Cir. 1992).  When the standard embraced in Rule 56(c) is met, summary judgment is

mandatory.  *Celotex Corp.*, 477 U.S. at 322-23; *Thomas & Betts*, 138 F.3d at 291; *Shields Enters.*,

975 F.2d at 1294.

## B.  PATENT INFRINGEMENT

Reviewing whether a product infringes a patent is a two step process.  *See CAE Screenplates*,

224 F.3d at 1316; *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999).  First, a court

must interpret the disputed claims, "from a study of all relevant patent documents," to determine

their scope and meaning.  *K-2 Corp.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999).  *See also Dolly, Inc. v.*

*Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 397 (Fed. Cir. 1994).  Second, a court must determine

if the accused device comes within the scope of the properly construed claims, either literally or by

a substantial equivalent.  *See K-2 Corp.*, 191 F.3d at 1362; *Dolly*, 16 F.3d at 397; *SmithKline*

*Diagnostics v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

## C.  UNENFORCEABILITY — INEQUITABLE CONDUCT

The defense of inequitable conduct arises from a patent applicant's[1] breach of the duties of

candor, good faith and honesty in prosecuting an invention.  *See  Molins PLC v. Textron, Inc.*, 48

F.3d 1172, 1178 (Fed. Cir. 1995).  Success with such a defense renders the patent unenforceable.

---

[1]"Applicant" in this context "includes anyone under a duty to disclose material
information to the PTO pursuant to 37 C.F.R. § 1.56, namely:  the inventor, the prosecuting
attorney or agent, and anyone associated with the inventor or the assignee who is substantially
involved in the preparation or prosecution of the application."  *Bruno Ind. Living Aids, Inc. v.*
*Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1351 n.3 (Fed. Cir. 2005) (citing *Molines PLC*, 48
F.3d at 1178 n.6).

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1366 (Fed. Cir. 2001).  To

prove its defense, Voest must establish by clear and convincing evidence "misrepresentation or

omission of a material fact, together with an intent to deceive the PTO."  *Hoffmann-LaRoche, Inc.*

*v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed. Cir. 2003).  Once Voest has evidenced the requisite

levels of materiality and intent, the Court, considering all the circumstances, "must determine

whether the equities warrant a conclusion that the patentee has engaged in inequitable conduct."  *Id.*

(citing *Molins PLC*, 48 F.3d at 1178).  *See also Purdue Pharma*, 237 F.3d at1366 (stating that once

the threshold findings are made, the Court must weigh "the materiality and intent in light of all the

circumstances to determine whether the applicant's conduct is so culpable that the patent should be

held unenforceable").

With respect to the element of materiality, the Federal Circuit has recently ruled that the

materiality standard is a flexible one in which either the pre-1992 standard or the post-1992 standard

may apply in a given circumstance.  *Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309,

1315-16 (Fed. Cir. 2006).  Prior to 1992, the generally accepted standard for materiality was that

information is material "when there is a substantial likelihood that a reasonable examiner would

consider it important in deciding whether to allow the application to issue."  *Id.* at 1314 (citing

*Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363 (Fed. Cir. 2003)).  *See also*

*Hoffmann-LaRoche, Inc. v. Crystal Chem. Co.*, 323 F.3d 1354, 1367 (Fed. Cir. 2003).  The newer,

and more narrow, standard, based on a revision of the PTO manual, provides that information is

material when:

> [I]t is not cumulative to information already of record or being made of record in the
> application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant has taken in:

    (i) Opposing an argument of unpatentability relied on by the Office, or

    (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b) (2004). *See also Digital Control*, 437 F.3d at 1314; *Bruno*, 394 F.3d at 1352-53 (applying new PTO rule to materiality determination). "[T]o the extent that one standard requires a higher showing of materiality than another standard, the requisite finding of intent may be lower." *Digital Control*, 437 F.3d at 1316 (referencing *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir. 1984)).

The second threshold requirement is intent to deceive. Intent is rarely proven by direct evidence; it "is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information." *Bruno*, 394 F.3d at 1354 (citing *Paragon Podiatry Lab., Inc. v. KLM Labs. Inc.*, 984 F.2d 1182, 1193 (Fed. Cir. 1993)). However, gross negligence alone is insufficient to establish intent. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988). The *Kingsdown* court stated that "the involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Id.*

## D.  INVALIDITY — ANTICIPATION & OBVIOUSNESS

By statute, a patent is presumed to be valid. 35 U.S.C. § 282. The party challenging a patent's validity must prove invalidity by clear and convincing evidence. *See Apple Computer Inc.*

*v. Articulate Sys., Inc.*, 234 F.3d 14, 26 (Fed. Cir. 2000); *Oney v. Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999) (citing *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354 (Fed. Cir. 1999)); *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984). In the present procedural posture, "[s]ummary judgment is inappropriate if a trier of fact applying the clear and convincing standard could find for either party." *Oney*, 182 F.3d at 895.

An accusation of anticipation is based on the requirement that an invention be novel or new. "The novelty requirement lies at the heart of the patent system." I DONALD S. CHISUM, CHISUM ON PATENTS § 3.01 (Rel. No. 71, Sept. 1999) (hereinafter "CHISUM ON PATENTS"). The defense of anticipation "requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee." *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed. Cir. 1995). *See also MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 2000); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1349 (Fed. Cir. 1998); *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1461 (Fed. Cir. 1997). A challenger cannot prove anticipation "by combining more than one reference to show the elements of the claimed invention." CHISUM ON PATENTS § 3.02. Thus, a prior patent or device must contain all of the elements and limitations in the disputed patent as arranged in the patented device. *See C.R. Bard*, 157 F.3d at 1349; *Hoover Group*, 66 F.3d at 303. But, "a prior art reference may anticipate when the claim limitations not expressly found in that reference are nonetheless inherent in it." *MEHL/Biophile Int'l*, 192 F.3d at 1365. Anticipation is a question of fact, but may be decided on summary judgment if there is no genuine issue of material fact. *Oney*, 182 F.3d at 895.

Novelty also is related to the nonobvious requirement. If the invention is novel, then "further inquiry must be made into whether it is new enough" to be patented. CHISUM ON PATENTS § 3.01

22

"A claimed invention is unpatentable if the differences between it and the prior art 'are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.'" *Robotic Vision Sys., Inc. v. View Engr'g*, 189 F.3d 1370, 1376 (Fed. Cir. 1999) (quoting 35 U.S.C. § 103(a)). *See also Graham v. John Deere Co.*, 383 U.S. 1, 13-14 (1966); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662 (Fed. Cir. 2000); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999). Determination of whether or not an invention is obvious is a legal conclusion. *Ruiz*, 234 F.3d at 662; *WMS Gaming*, 184 F.3d at 1355. However, the underlying inquiries are factual. *Ruiz*, 234 F.3d at 662; *WMS Gaming*, 184 F.3d at 1355. The factual inquiries for obviousness are 1) the scope and content of the prior art, 2) the level of ordinary skill in the field of the invention, 3) the differences between the claimed invention and the prior art, and 4) any objective evidence of non-obviousness, such as long-felt need, commercial success, the failure of others, or evidence of copying. *See Ruiz*, 234 F.3d at 662-63; *WMS Gaming*, 184 F.3d at 1355; *C.R. Bard*, 157 F.3d at 1351. As discussed above, the party asserting invalidity based on obviousness carries the burden of proof; however, that burden "is more easily carried when the references on which the assertion is based were not directly considered by the examiner during prosecution." *WMS Gaming*, 184 F.3d at 1355 (citing *Applied Mat'ls, Inc. v. Advanced Semiconductor Mat'ls Am., Inc.*, 98 F.3d 1563, 1569 (Fed. Cir. 1998) ("The presentation at trial of additional evidence that was not before the PTO does not change the presumption of validity or the standard of proof, although the burden may be more or less easily carried because of the additional evidence.")). *Accord Am. Hoist & Derrick*, 725 F.2d at 1360.

When a challenger asserts an obviousness defense or counterclaim based on two or more prior art references, there must be some suggestion or motivation to combine them. *WMS Gaming*,

184 F.3d at 1355. "The suggestion to combine may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *Id.*

### III. <u>DISCUSSION</u>

The Court chose to address all of the parties' motions in one order because they all turn on related questions of material fact. The infringement issue turns, in large part, on whether or not Voest's accused steel splined pipe has a base section, as required by each of the independent claims, claims 1, 17, and 19. Taken out of the context of its argument, it would appear that Voest concedes this issue in its brief in opposition to AmeriFab's motion for partial summary judgment on infringement because it says: "In light of the Court's broad construction of 'base section,' Voest-Alpine concedes that independent claims 1, 17, and 19 read on its steel splined pipe accused of infringement." Def.'s Br. in Opp'n Pl.'s Mot. for Partial Summ. J., at 2 (footnote omitted). Within the context in which the statement is made, however, Voest really only concedes the infringement issue if the Court decides to rule in Voest's favor on its own motions for partial summary judgment.[2]

_____

[2]The Court notes that it is dangerous to make this type of concession without making it clear that it is for purposes of summary judgment only, or that it is only with the caveats further delineated in the brief. In this case, the heading of the section in which Voest's statement appears is: "Voest-Alpine's Steel Splined Pipes Do Not Infringe Upon The '269 Patent If The Prior Art Does Not Include The Claimed 'Base Section." Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 2. Here, it appears that Voest is arguing that if the thickened portion of its pipe is a base section as that term is used in the '269 patent, and defined by the Court, then copper splined pipe and the other prior art discussed by Voest in its motions regarding unenforceability and invalidity must also have a base section and render the '269 patent either unenforceable or its claims invalid. In other words, the Court takes Voest's "concession" as one for purposes of summary judgment only, and with the caveats further set forth in its brief about the scope and content of the prior art, and the concomitant effect the prior art would have on the enforceability or invalidity of the '269 patent.

But, in order to rule in Voest's favor on its two motions, one on unenforceability and one on invalidity, the Court must decide that copper splined pipe was prior art that the inventors intentionally withheld from the examiner, that copper splined pipe was material, and that the prior art references identified by Voest to prove anticipation and/or obviousness actually teach and have the scope that Voest claims. On the current record, the Court is unable to make these decisions as a matter of law.

First, the parties' briefs ignore the Court's definition for the term "base section." The Court's claim construction order states that in the context of the '269 patent, "base section" means "a support or foundation portion." There is nothing in this definition that decides, as a matter of law, that any portion opposite the fins, regardless of shape or contour, is a base section. In fact, the definition necessarily requires that the base section is "a support or foundation portion." It is the Court's view that there is a question of fact on the issue of whether or not Voest's allegedly infringing pipe has a "base section" as that term has been defined by the Court. Just because Voest's allegedly infringing product is a pipe with a thickened portion opposite the ridges or fins does not mean that the thickened portion is "a support or foundation portion." Reasonable minds may disagree on the answer to that question. *Accord Dorel Juvenile Group, Inc. v. Graco Children's Prods., Inc.*, 429 F.3d 1043, 1047 (Fed. Cir. 2005) (discussing a case in which the Federal Circuit found a question of fact on the issue of whether a particular configuration of a product infringed certain terms of a patent, the claims of which had been correctly construed by the district court).

Similarly, there are material questions of fact on whether or not the pre-February 1999 copper splined pipe has a "base section" as that term was defined by the Court. Evidence has been admitted on both sides of the question of whether pre-February 1999 copper splined pipe had a thickened

portion opposite the fins.  In addition, there is a question of fact on the materiality of the copper

splined pipe as a reference, under either materiality standard.  In its brief in support of its motion for

partial summary judgment on invalidity, Voest contends that a person of ordinary skill in the art was

an "ordinary layman of average intelligence" because the technology is "essentially an oddly shaped

pipe" and "[t]he technology is not in the least bit complex."  Def.'s Br. in Support of Mot. for Summ.

J. Invalidity, at 4.  But if this is the case, then the copper splined pipe was known to such a man, and

ostensibly, known to the patent examiner.  Arguably, then, presenting such pipe to the examiner

would have been cumulative.

Furthermore, the Federal Circuit has made clear that with respect to invalidity because of

anticipation or obviousness, and even in the context of an inequitable conduct argument based on

the failure to present a reference to the patent examiner as prior art, the scope and content of the prior

art and what it teaches are questions of fact.  *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346

(Fed. Cir. 1999) (discussing the issues of fact in an anticipation analysis); *Syntex (U.S.A.) LLC v.*

*Apotex, Inc.*, 407 F.3d 1371, 1378 (Fed. Cir. 2005) (discussing the relevant factual inquiries for a

determination of obviousness); *Digital Control*, 437 F.3d at 1319 (discussing prior art with respect

to an inequitable conduct argument).  As the Court has already discussed, there is a material question

of fact on whether or not copper splined pipe teaches anything about the '269 patented invention,

and whether it was material prior art.  In addition, the other references Voest relies upon for its

invalidity argument are not clearly defined.  Voest bases much of its anticipation argument on the

pictures presented in the relevant references.  However, the claims of those references, and the

specification describing those inventions, do not necessary teach as much as Voest claims.

For example, the claims of the French patents do not reference a base section.  Therefore, in

order for the French patents to anticipate the '269 patented invention the finder of fact must conclude that such a term is inherent in that reference. The Court finds that the claims and the specification of the French patent may or may not teach the term "base section" has been defined by the Court. French '648 Patent, at 4, *ll.* 1-13; '561 Patent, col. 4, *l.* 64 to col. 6, *l.* 9. Furthermore, as pointed out by AmeriFab, the claims and specification of the French patents do not necessarily teach that the finned portion of the tubes are in direct contact with the material to be heated. French '648 Patent, at 3, *ll.* 6-11; '561 Patent, col. 4, *l.* 64 to col. 6, *l.* 9 & col. 3, *l.* 60 to col. 4, *l.* 6. In fact, if the drawings are the only reference, it appears that the finned tubes are actually encased inside of a box rather than having direct contact with any material to be heated. French '648 Patent, at Figs. 2 & 3; '561 Patent, Figs. 6 & 7. The '561 patent specification's reference to the slag being retained on the outside wall of the panel, '561 Patent, col. 3, *l.* 60 to col. 4, *l.* 6, would support such a conclusion.

Finally, as AmeriFab also points out, other than the suggestion that the pictures of the preferred embodiments of certain references may "add up to" the '269 patented invention, Voest has little other argument or evidence that there would be a motivation to combine the references such that the combination would render the '269 patented invention obvious. Whether those references inherently suggest a motivation to combine is a question of fact that cannot be resolved on the current record. *See Syntex*, 407 F.3d at 1378.

For all of these reasons, the Court finds that there is a material question of fact on the issues raised by the parties' motions for summary judgment.

## IV.  **CONCLUSION**

For the reasons stated above, the Court **DENIES** plaintiff's, AmeriFab Inc., Motion for

Partial Summary Judgment of Infringement of the '269 Patent, **DENIES** defendant's, Voest-Alpine

Industries, Inc., Motion for Summary Judgment of Patent Unenforceability Due to Inequitable

Conduct, and **DENIES** defendant's, Voest-Alpine Industries, Inc., Motion for Partial Summary

Judgment of Patent Invalidity.   Defendant's, Voest-Alpine Industries, Inc., Motion for Oral

Argument on Pending Dispositive Motions is **DENIED**.

IT IS SO ORDERED this 10th day of May, 2006.

_____
LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronically distributed to:

Richard Eric Gaum
HAHN LOESER & PARKS LLP
regaum@hahnlaw.com

Spencer Patrick Goodson
BARNES & THORNBURG  LLP
sgoodson@btlaw.com

Bret A. Hrivnak
HAHN LOESER & PARKS LLP
bhrivnak@hahnlaw.com

Donald E. Knebel
BARNES & THORNBURG LLP
donald.knebel@btlaw.com

James R. Sweeney II
BARNES & THORNBURG LLP
jsweeney@btlaw.com

Edward F. Welsh
ARMSTRONG KRATZ QUINTOS HANSON
  & BROOKS LLP
efwelsh@acba.org